Good morning, ladies and gentlemen. Our first case of the morning is case number 118372, 1010 Lake Shore Association v. Deutsche Bank National Trust Company. Are you ready to proceed? Ready? Good morning. Good morning. Please report. Counsel. Lee Marshall on behalf of Deutsche Bank National Trust Company. This is a statutory construction case where the primary objective, of course, is to ascertain and give effect to the intent of the legislature. The question for this court to resolve is whether the legislature intended the Condominium Property Act, which I'm going to refer to as the CPA, to conflict with and displace the Illinois Mortgage Foreclosure Law, the IMFL, or whether the legislature intended the CPA and the IMFL to work together in a harmonious fashion. The Court of Appeals held that they conflicted and that the CPA governed as the more specific statute. We believe the Court of Appeals was wrong for several reasons. First, the legislature consistently intended the CPA and IMFL to be read together, not to conflict. And, of course, as a baseline, this court should presume that the legislature intended two statutes which relate to the same subject matter, that they should be read harmoniously. In this case, there's every indication that the legislature intended just that. The Illinois Mortgage Foreclosure Law expressly governs the foreclosure of condominiums. In fact, it refers to condominiums in no less than three sections. The Condominium Property Act was amended most recently in 2006 at Provisions 9G4 and 9G5. At that time, they also amended the Illinois Mortgage Foreclosure Law. So they knew that these two statutes worked together, and they were amending them at the same time. And most relevant is the section that's at issue here, 9G3, expressly refers to the IMFL in the text of that subsection. So we have what we believe to be a clear indication that the legislature is trying to get these statutes to work hand-in-hand, not to conflict with each other. They should be interpreted together, and they should be interpreted harmoniously. Now, counsel, I'm not sure it's relevant to any of the issues, but I am curious why defendant never paid the assessments it conceded it owed. Your Honor, that's a great question. And if they had, would we even be here? Well, that was, I believe, one of my client's concerns, Your Honor, is, you know, and when I first got into this case after the Court of Appeals ruling, I asked the exact same question. And the answer is that the Condominium Association, after the sale was confirmed and the deed was transferred, issued a demand for $62,000. That included, 43,000 of which included the prior unit owner's unpaid assessment before my client took title and before the judicial foreclosure sale. There was a very significant concern that if we had begun to pay assessments on a going-forward basis, that those would have been credited not towards the new assessments, but towards the unpaid assessments of the prior owner. And there's some indication that that's, in fact, how it would have been credited. So we would have been in a situation where we would have been likely accused of voluntarily making those payments. And there was a significant concern that if we did that, then we'd be litigating that issue as well and potentially mooting this broader issue that is in front of the court. We certainly did not want to do that. With respect to the 9G-3, what seems very, very clear, and believe me, I understand that these statutes are complex, they're confusing, they're somewhat Byzantine, but what is absolutely clear is that the legislature did not intend to make a foreclosing mortgagee liable for prior unpaid assessments before the judicial foreclosure sale. There is no provision in the CPA or the IMFL which expressly makes foreclosing lenders liable for prior unpaid assessments. And the legislature knows how to do that if they chose to. And the best evidence of that is sections 9G-4 and 9G-5, where the legislature said that third-party purchasers at a judicial foreclosure sale other than mortgagees can be liable for up to six months of prior unpaid assessments. And when they did that, they did it very clearly, they did it expressly, and they also did it with notice. They amended the IMFL to make sure the notice of sale put purchasers on notice of that potential liability. What they didn't do in 9G-3 is any of those things. They didn't say it. They didn't clearly express it, and they didn't put anyone on notice of it. They didn't amend the IMFL to say that this should go on the notice of sale. They didn't do those things. And, in fact, if the Court of Appeals' reading of 9G-3 is correct, that prior unpaid assessments are a lien on the property, then 9G-4 really has no meaning. Because both 9G-3 and 9G-4 apply to third-party purchasers at judicial foreclosure sales. 9G-4 is added to say you can only be liable for six months of prior unpaid assessments. Well, the Court of Appeals' interpretation of 9G-3 is that they can be interpreted for an unlimited or they can be liable for an unlimited amount of unpaid assessments. Mr. Marshall, with regard to 9G-3, was there a meaning of the term confirmed? Yes, I would say. We don't disagree with the definitions that the Court of Appeals came up with from Black Law Dictionary to verify or corroborate, to make firm or certain. The word confirmed there, to me, denotes that they were trying to resolve uncertainty. It does not mean that we're going to allow a lien that's been previously extinguished to be revived and need to be extinguished again, which is effectively what the Court of Appeals held. One of my colleagues refers to this as a zombie lien because it comes back to life and then needs to be extinguished again. That's really problematic. Confirm cannot possibly mean that. If it is already extinguished, then confirming that it is extinguished does nothing further. It just resolves any uncertainty as to the extinguishment. Now, with 9G-3 and 9G-4, I want to draw out this contrast a little bit more because not only do you have a clear conflict between those two provisions under the Court of Appeals reading of 9G-3, where you've got a limitation of six months and then an unlimited potential liability under 9G-3, but if you look at the legislative history when 9G-4 and 9G-5 were enacted in 2006, when this six-month period of liability for prior unpaid assessments was enacted, the legislature knew exactly what it was doing there. And it stopped, and it recognized that this was a significant change, that it is significant we are going to make a purchaser to judicial foreclosure sale liable for up to six months of prior unpaid assessments.  The legislature had a big debate about it. This was in 2006. They recognized that it was a significant, and I'm quoting here, a significant change in the public policy of the state of Illinois. One representative called it a massive change of law, that it fundamentally changes the foreclosure law in Illinois because foreclosure is done to extinguish liens. And now we're allowing a basically, and one legislator called it this, a super priority lien for six months of unpaid assessments for the condominium association. So 2006, they recognized huge change. 1991, when the second sentence of 9G-3 is added, it's called a minor clarifying change, a technical amendment. There was no recognition whatsoever that this minor clarifying change, this technical amendment would work the kind of fundamental massive change to the law that the court of appeals found here making a purchaser at a judicial foreclosure sale liable for an unlimited amount of prior unpaid assessments. No recognition. And one would think that when legislators are told in 1991, when the second sentence of 9G-3 goes in, that the amendment is minor, clarifying, and technical, one would think that they did not intend that the amendment would contradict another statute, that it would conflict with established common law rules, that liens are extinguished at foreclosure, and that it would allow for the revival of a previously extinguished lien without clearly saying that and without providing the type of notice provision that was added to the IMFL in 2006 for this six-month period. None of that happened here. There is a clear record here that the legislature did not intend the result that the court of appeals found here. Now, let me explain why these two provisions don't conflict. A provision extinguishing a lien is not in conflict with a provision that confirms the extinguishment of a lien. The IMFL only bars future claims by lien holders who are joined in the foreclosure action. The word confirm, we're resolving uncertainty. Well, where might uncertainty exist? Uncertainty might exist if, for example, the lien holder, the condominium association, was not joined in the foreclosure action. And that's exactly what happened in the Pembroke case. There, the association was not joined as a party to the foreclosure so that the IMFL provision, which is 1509C, did not bar future claims, did not extinguish the condominium association's lien. And presumably, they were not joined because their lien was not recorded. And, in fact, that is frequently what happens with condominium assessment liens. They're frequently not recorded. So third-party purchasers at foreclosure sales are unaware of them. Condominium associations are frequently not joined in foreclosure proceedings under the IMFL as a result. So we're in a situation where foreclosure, of course, a third-party purchaser at a foreclosure is looking for clear and marketable title. How can we resolve that uncertainty? Well, we've got a second mechanism. We have 9G3. And the second sentence of 9G3, of course, says we're going to confirm the extinguishment of any lien by the condominium association under 9G1 or 9G2. And so, Your Honor, my answer to your question is what did confirm mean? My answer is resolve uncertainty. If there's uncertainty about whether the lien has been extinguished, if there's uncertainty as to whether a lien exists, because the condominium associations frequently don't record them,  if there's uncertainty, we're going to confirm the extinguishment of the lien. Now, there's a second type of potential. If the condo association is not named as a party in that circumstance, their lien is not extinguished, is it? It's not extinguished by the IMFL. It is extinguished by 9G3 if the payments of the assessments are made following the judicial foreclosure sale. And that's precisely what the court held in Pembroke. And that is how you interpret these two statutes which are intended to work together. That's how you interpret them to work together. They're not in conflict. One extinguishes liens if the foreclosure sale joined the condominium association. That's the IMFL. The other resolves any uncertainty if, for example, the condominium association was not joined, perhaps because the lien was not known, was not recorded. Now, there's another type of potential uncertainty, and this goes to the first sentence of 9G3. The first sentence of 9G3, which was added in 1988, worked a change in the law. Prior to 9G3 being added, it was clear under the case law, and the Newport Condo Association case tells us this. It was clear that the foreclosing lender was not liable for any condominium assessments until they actually took title. They had to have title to be liable for the assessments. Well, that decision came out in 1988. In 1988, 9G3, the first sentence of 9G3 was added, which said we're going to impose a duty on any third-party purchaser to foreclosure to pay the assessments back to the time of the judicial foreclosure sale. So there was this, what I would call sort of a no-man's land. You've got a unit owner who's getting foreclosed on. The judicial foreclosure sale happens. I would say the vast, vast majority of unit owners at that point are going to stop paying assessments if they were paying them at all. They're not going to pay assessments after the judicial foreclosure sales happen. But the foreclosing purchaser wasn't liable until they took title, which frequently happens several months or in some cases, in this case, 18 months later because the unit owner decided to litigate the issue. And so there was this no-man's land where nobody was really paying those assessments between the time of the foreclosure sale and the time of the confirmation of the sale. So they added 9G3 to try and clear up that no-man's land and say, okay, if you're going to come in and foreclose, you should go ahead and pay those back to the judicial foreclosure sale after the sale is confirmed and you take title. Well, three years later, that second sentence of 9G3 was added where it says such payment confirms the extinguishing of the lien. Again, resolving uncertainty. In that no-man's land, is there a lien? You still have the unit owner who's potentially liable for that. Let's resolve that uncertainty. Let's make sure that, hey, foreclosing purchaser, if you go ahead and make those payments back to the judicial foreclosure sale, which previously you were not on the hook for, we're going to confirm the extinguishment of the lien. We're going to resolve that uncertainty. And that's exactly what the legislature did. So, again, two provisions. IMFL, the condominium association joins the party. Lien extinguished. CPA, condominium association not joins the party. Counsel, does the such payment language seem at odds with 15-1509C that all claims of parties to the foreclosure are barred? Does that seem at odds? Your Honor, I don't think so. I think that, you know, I mean, I think the Pembroke situation is a perfect example of that. And the court said there that 1509C doesn't come into play because the condominium association wasn't a party to the foreclosure. So 1509C did not bar the condominium association's lien and did not extinguish the lien there. The lien, by the way, in that case was unreported, unknown. And so the court then looked to Section 9G3, that such payment confirms, and said, well, the foreclosing lender in that case made the payments. That confirmed the extinguishment of the lien. And that resolved the uncertainty. So, you know, the other point I suppose I would like to make before I sit down, unless there are any other questions, is this is also consistent, you know, with the common law rules. And, you know, a common law, you go into foreclosure, you're extinguishing all the junior lien holders. You are getting clear and marketable title, which is in the public policy interests of the state of Illinois to make sure that foreclosing purchasers do get clear and marketable title. And that's what the common law allowed for. The legislature, when it passed a minor clarifying amendment, a technical amendment in 1991, they were not trying to change those established common law rules. They were not trying to work a massive public policy change in the state of Illinois. Now, they did that in 2006 with the six months, but they knew they were doing it then. Thank you. Thank you. May it please the Court, Matthew Goldberg on behalf of 1010 Lakeshore Association Council. I'd like to start off by just saying thank you for having us here today. I know for me this is like a dream come true and one I never thought I'd experience in my legal career, so thank you for that. I'd also like to pay my respects to my first mentor in this business, since I am standing here. He's an attorney I think many of you probably knew. I got to follow him around to appellate courts, and the best way I can think of to honor him would be by telling a little story very briefly. I do a lot of foreclosure and detainer work, condominiums, collecting assessments, as well as landlord-tenant. About six years ago I had a landlord-tenant case involving an apartment in Streerville, which is a few blocks from Navy Pier in Chicago. The tenant in this property was an up-and-coming musician who couldn't afford to pay the rent. An eviction proceeding was started, and at some point in time the tenant moved out, so we had to proceed to service by posting under Section 107 of the Forcible Act. Section 107 allows you to post notice, and in a landlord-tenant case when that happens, you can only get an order for possession, not a money judgment against the tenant. And we proceeded and got possession back that way. About six months later I got a call from my client, who travels internationally quite a bit, called me up, Hey, Matt, I'm in Japan at a trade show. You will never guess who our entertainer is tonight. Obviously it was our wayward tenant. We got him an alias summons, which he was able to get served on the tenant, and when we appeared before the court, where we already had our order for possession, the judge looked at me and said, Mr. Kohlberg, how can you do this? You already have a judgment. I said, Judge, I would point you out to Section 107 of the Forcible Act. There's a small sentence at the end of the first paragraph, which says after you get a judgment by posting, the claim for rent may remain pending until such time as the defendant is served with summons. The judge looked at me in disbelief. She read the statute a few times and finally looked up and said, Congratulations, Mr. Kohlberg, you just won your case. Now the point of my story is, every sentence in the statute matters. You have to consider, you can't read it so it's meaningless, you can't read it so it's superfluous, and you certainly cannot ignore it as if it doesn't exist. As counsel mentioned, you're here today to interpret the second sentence of 9G3. The canons for interpretation start with plain meaning, which really isn't in dispute here. I know counsel would argue the definition of confirms, but both the Pembroke case relied upon by Deutsche Bank, as well as the 1010 case here before you today, both came to the same conclusion as to the plain meaning. That is the payment of said assessment, which confirms the extinguishment of the lien. Where the cases differ is in the application of that language, but the meaning of it really isn't in question. So under a plain meaning approach, the 1010 case should be affirmed. The second method is impari materia. If you believe 9G3 is in conflict with the plain language of the IMFL, then use impari materia or the harmonizing of the statutes. You've been provided with two options for harmonizing the statutes. The 1010 option is to treat it as an additional step in the foreclosure process. The foreclosure process is a general process for closing liens, and junior liens and other claims against title, to sell the property. It applies to all properties covered by the IMFL. The Condominium Act is specific to condominiums and adds an extra step, 9G3, in which this payment must be made in order to confirm the extinguishment of the lien. This concept is not foreign. It's not something we haven't seen. If you think about what it really is doing and what was going on back at the time the statute was passed, you had banks who were purchasing these units and weren't paying assessments. And the legislature has already told us how important it is for these associations to get those assessments. And this and many other courts have recognized that. Here in Spanish II, in the Lake Hinsdale case, it's easily recognizable why a not-for-profit needs these assessments in order to pay its bills. So the concept is simply almost one of unclean hands. Or if you were to liken it to contract, the non-breaching party, excuse me, the claiming party, can't be in breach under the contract. All 9G3 really does is say you want to enforce this equitable termination of the association's lien, we want you to pay your new assessments and not avoid that responsibility. So it's a tool we already have in our legal chest and it makes sense. Take now the Pembroke case, which is the alternative option presented by Deutsche Bank. The Pembroke case holds that the 9G3 language is limited to situations where an association is not named in a foreclosure. Now 9G3's language makes no such distinction. Also, taking that approach ignores another section of the Condominium Act, 9G1, which was also amended after Newport, which is the case that Pembroke, of course, relies upon. The last sentence was added to say in any action to foreclose an association's lien, the association shall be named as a party. So it's not permissive. And this really also is not a foreign concept. It's due process. And why is it so important for an association to have it stay in court? Again, I would point you to the Lake Hinsdale case. The unrecorded lien recognized under 9G1 has to be accounted for and it gets perfected as of the date of nonpayment, unlike other liens which must be recorded to get its perfection date. Excuse me, counsel, could you just repeat that last statement about recorded? Under 9G1, 9G1, the first sentence says that the association has a lien for unpaid assessments as of the date of nonpayment, and its lien is superior to all other liens recorded or unrecorded except for taxes and those liens that were recorded before the first nonpayment. And the facts in the Lake Hinsdale case were the association's assessments went unpaid before the state's lien for the unpaid medical bills. Now, the association's lien was later recorded and they foreclosed it, but there was a fight between the two over who had priority, the government's lien which was recorded before the association's or the association's, and Lake Hinsdale, of course, says, no, no, no, 9G1, condo comes first, and all assessments after relate back to that date. So we see from Lake Hinsdale the importance of this lien and the power of it. Now, I mentioned before due process, we know from this Court's decision in Hogan v. Bleeker, a statutory lien is property, and that's what the association's lien is under 9G1. We know from Fuentes v. Shevin, a U.S. Supreme Court case, that any property right, no matter how large or how small, must be given due process before the owner can be deprived. To do what Pembroke did and not name the association in the case and then say it's simply deprived under 9G3 avoids the possible argument under Lake Hinsdale that, hey, we have a superior lien potentially. They weren't given their day in court. And Shevin even says, even if that weren't the case, even if you would have won on the merits had you named them, the fact that you hadn't named them matters. So it doesn't matter whether you would have won or not with the unclaimed lien, with the unrecorded lien. What matters is you weren't given your opportunity in court. And that makes the Pembroke case an unconstitutional reading of 9G3. And, again, you've only been provided two options, and I'm not challenging the court to come up with a third. You've been provided two options for harmonizing the statutes. The extra step approach, which follows other mechanisms we have in the law and recognize in the common law, or this unconstitutional due process violation. If you agree with me it's unconstitutional and a due process violation, that's not a reasonable harmonization. And that is the key factor in harmonizing. It has to be reasonable. So if you take that one off the table, you're left with the extra step approach. And, again, the 1010 case should be affirmed under that reading. If you feel that the two statutes are simply in conflict and can't be harmonized, you go to other interpretive aides. And this Court had the opportunity to review those in cases like Abruzzo and more. And the factors you look at are which are the more recent, which statute is the more specific. And those really aren't in dispute here today. It is the Condominium Association's 9G3, which is the more recent compared to the IMFL. And the Condominium Act is very specific to, obviously, condominiums. Now, this Court had the opportunity to review a similar situation. Remember, the IMFL is part of the Code of Civil Procedure. This Court reviewed the Knowles v. Harms case, which involved another section of the Code of Civil Procedure, Article 12, Section 9, which is the Homestead right. And in that case, the Court again said, the Condominium Act is more specific to the collection of assessments. It was also the more recent there. But also looking at the legislative history, and if you look at the history on 9G3, and you can look at both sentences, 9G3 Part 1 was added in 1989, a year after the Newport case. And if you look at the comments from the legislature, they all have a common theme. When does the judicial sale purchaser have to pay new assessments? So the legislature knew exactly what it was trying to address in that legislation. A few years later, we had the second sentence of 9G3. And again, there are three comments, and all three are cited in the 1010 case. And again, although the comments vary a little bit, all three have the same underlying intention. How and when is the association's lien foreclosed? And all three of those statements make that same, get that same idea across. That is what the legislature was trying to accomplish when it enacted the second sentence of 9G3. How does 9G4 fit in with this? I'm glad you asked. That's a great question. So 9G3 does not conflict with 9G4 and 5 under either interpretation. They basically sit in their own separate spheres, which I believe was the Harris v. Thompson case. 9G3 affects any judicial sale purchaser. 9G4 and 5 affects only a judicial sale purchaser or third-party purchaser other than the mortgagee. So they're different actors. 9G3 affects the entire 9G1 lien. 9G4 and 5 affect only a specific six-months carve-out. So 9G3 affects current rights and obligations, where 9G4 and 5 affects future rights and obligations. They affect different actors in different scenarios. And so there is no effect between 9G3 and 9G4 and 5. In fact, I would suggest 9G4 and 5 assumes compliance with 9G3, which should have happened all along. One other point that was made up here today was the enumeration of exceptions. It was argued that the IMFL contains exceptions within it that are specifically enumerated, and if those exceptions aren't found, then they shouldn't be considered. And because the Economy Act is not an enumerated exception, it wasn't intended to be. Again, I would turn to Knowles v. Harms, where that exact same argument was rejected by this Court unanimously. In Knowles v. Harms, again, it dealt with the Homestead Act. And the defendant in that case argued that under the Homestead Act, there are a list of exceptions that need to – that apply to the Homestead Exemption, and the Condominium Association Claim is not one of them. Therefore, the Condominium Act and the Right to Collect Assessment should not be read as an exception to the Homestead Act. And this Court said, no, that's not accurate. I would encourage you to follow the exact same reasoning in Knowles v. Harms. Counsel, I think it sounds like you have these sections of the Act memorized, but 9G5, when it talks about the Statement of Assessment account that's issued to a unit owner under Section 18 and then the Disclosure Statement that's issued when somebody is buying, I think that's the 22.1. What I'm trying to get at is what Mr. Marshall was arguing before, that typically these outstanding assessments are not recorded. So as a practical matter, does the language in 5 answer how someone in his shoes, a client, would actually discover this information when it's not recorded? And I'd answer you with a simple hypothetical. Does the police officer pull out the rule book when he says, you just ran the red light? It says right in 9G1 that the association has a lien, whether it's recorded or unrecorded, and that it's perfected as of the date of nonpayment. And it says the association shall be named in the foreclosure case. It's there for a reason. It's there because the legislature wants to protect these assessments. It recognizes living in a condominium is like going out for a dinner party, and one person gets up before the bill comes and leaves. Everyone else has to pay that bill. And the legislature holds these assessments dear and recognizes the importance that the association be able to collect them. And we have a lot here that has gone uncollected. So I hope that answers. Well, I'm just trying to think this through. If Deutsche Bank wanted to find out, would they have the right to get that information from the condominium? They're not a prospective purchaser in the 22.1 context, are they? No, but they actually do have a right, and the Lake Hinstel case covered that as well. I think it's now, forgive me, I'm going to get the wrong section. I believe it's either 19I or 18.4I, one of those three, which says that someone who holds a lien, any lien holder, has the right to request the account history of the unit and it shall be provided on within 10 days. And that issue came up in Lake Hinstel, and the court addressed it and said, you could have asked for this. You have a recorded lien. You could have asked for that ledger, and you had the right to essentially redeem it, to pay off those assessments to perfect your lien or put it in the first position, and then you would have been fine. You chose not to do it. That's on you. And 9G3 really should be looked at the same way. Going back to my point about equity and clean hands, Deutsche Bank chose not to pay these assessments, and I realize that the suggestion is, well, we thought we'd be in court on two issues if we hadn't paid it, if we'd paid part of it versus one. They could have sent in the check with a letter or language on the check that said, this is for payment of assessments from this date forward and shall only be applied for this date forward. That would have either had a legally binding effect or at the very least would have become a factual issue they could have presented to the court saying, we tendered this money, we made it available to them to pay off these assessments and do what we were supposed to do. They refused it. They rejected it. That would have been a very different case. But those aren't the facts. Going to the definition of uncertainty, or I'm sorry, of confirm, I think if you read this the way defendants suggest on terms of, you know, to confirm just means to make certain, there really was no problem with 9G3 before the second sentence was added. Everyone understood that the purchaser had to pay the new assessments and there was no question that under the old reading of 9G3, before the second sentence was added, that there was no effect of the nonpayment in terms of prior assessments. So to add this language didn't clean up or confirm, excuse me, something that already happened. It was added, I think, for a purpose. I think it was added to say, you know what, banks, you have this money. You should have been paying it all along. We're not going to help you if you're not going to pay your assessments. So I think this was intentional. Now a couple, I think if you're balancing the equities, well first actually if you go back to the legal interpretation, the canons, I think if you look at plain language, I think 1010 should be affirmed. The plain language really isn't in conflict. If you look at in-party material, there's really only one option that works and that is the extra step method. And again, the 1010 case should be affirmed under that method. And lastly, if you look at the other interpretive aids, which was the more recent, which was more specific, what were the comments of the legislature, again, I think 1010 should be affirmed under that scenario. There are two ironies that come out of this case that I want to finish up with. As I mentioned before, I've been doing this for a long time and I've been dealing with banks for a long time who don't want to pay assessments. Before the 1010 case came out, we would send these demands to banks or even talk to the bankers saying, pay your assessments. And the excuse we would get universally from the bank was, don't worry, we will pay you when we sell the unit. Now what makes this so ironic is that's the exact same excuse, if you will, that the mortgagors were giving their lenders, mortgagees, I will pay you the mortgage I'm trying to sell the unit and I'll pay you back the mortgage when I get it sold. Don't foreclose on me. These Goliath banks didn't accept that excuse. Why should the associations accept it from them? Second, and I think in hindsight being 2020 and seeing the 1010 case, 9G3 worked. And what I mean by that is, now after the foreclosure sale is confirmed, my colleagues and I get calls almost the next day, we get emails right away from these institutions saying, hey, we want to pay these assessments right now so we don't have this 1010 issue. 1010 worked, 9G3 worked. Banks are now doing what they're supposed to do and I think that's very important to consider. Thank you again for having me today. Thank you, Counselor. Your Honor, 9G5 does not provide the notice that we're talking about here for foreclosing parties who are the mortgagee, such as Deutsche Bank. It only applies where it is a third-party purchaser of the judicial sale other than the mortgagee. So we have what you could refer to as almost a secret lien. And the court in the St. Paul Federal Bank case, which was a 1986 case, was talking about a slightly different issue, but it was concerned about this risk. It was concerned about the risk of exposing lenders to unknown risks that would undercut the principle embodied in the recordation and registration statute that persons who are about to acquire an interest in land are entitled to know the extent to which that interest is impaired. And it went on and it said it appears manifestly unfair to allow a condominium association to run up huge assessments, let them go unpaid for years, and we're talking about 10 years in this case, and then, in effect, assert them against a foreclosing lender when that could go as far as swallowing up the mortgagee's entire interest. Well, that was not what the legislature intended to do with 9G3 and 9G4. And, in fact, my colleague said that 9G3 and 9G4 affect different actors. That's both true and not true. It is true that 9G4 does not affect mortgagees. It clearly says other than mortgagees. But 9G3 affects everyone. It affects all third-party purchasers of conditional foreclosure sales, mortgagees and non-mortgagees alike. So if the Court of Appeals' decision is affirmed here, we've set up a situation where 9G4 is saying, you're limited for the non-mortgagees, you're limited to six months of unpaid assessments that you're going to have to pay for, and you know about it because it's in the notice of sale, and you're clearly on notice of it. 9G3 is saying unlimited. In this case, 10 years. And that affects mortgagees and non-mortgagees. The two positions cannot be reconciled. And the legislature knew when it enacted 9G4 in 2006 that it was a fundamental change, that it was a significant change to the public policy of the state of Illinois, that it was a massive change in the law. Your Honors, I would submit that that should not be extended here. That type of massive change should not be extended here for an unlimited period of prior unpaid assessments by the judicial branch. That that would be up to the legislature if they wanted to make that kind of massive change. We believe the Court of Appeals' decision should be reversed. Thank you. Thank you. Case number 118372, 1010 Lakeshore Association v. Deutsche Bank National Trust Company, will be taken under advisement as agenda number 22. Mr. Marshall and Mr. Goldberg, we thank you for your arguments this morning. You're excused at this time.